**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

DEVON HODGE and ANGELA FORREST,   )
                                  )
        Plaintiffs,               )
                                  )
    vs.                           )        Case No. 4:25-CV-811 JSD
                                  )
TURN KEY HEALTH CLINICS LLC, et al.,   )
                                  )
        Defendants.               )

## MEMORANDUM AND ORDER

This matter is before the Court on Franklin County Defendants' Motion to Dismiss Plaintiffs'[1] Third Amended Complaint (ECF No. 40), Turn Key Health Clinics, LLC's ("Turn Key") Motion to Dismiss Plaintiff's Third Amended Complaint (ECF No. 46), and Defendant Christophe Poinsett's ("Poinsett") Motion to Dismiss Plaintiffs' Third Amended Complaint (ECF No. 48). These matters are fully briefed and ready for disposition. Franklin County's motion is granted in part and denied in part and Turn Key's and Poinsett's motions are denied.

## BACKGROUND[2]

On January 15, 2024, Derek Hodge ("Decedent") was detained at the Franklin County jail on outstanding traffic warrants. (Third Amended Complaint ("Am. Compl."), ECF No. 39, ¶¶ 22-23.) Decedent was booked at approximately 4:00 pm by Franklin County employee Joshua Rash.

---

[1] Plaintiffs include Devon Hodge and Angela Forrest, the daughter and mother of Derek Hodge, respectively.

[2] When considering a Rule 12(b)(6) motion, the Court accepts the complaint's factual allegations as true and draws all reasonable inferences in the nonmoving party's favor. *See Miles v. Jefferson Cnty.*, No. 4:25-CV-00164-NCC, 2026 WL 100573, at *3 (E.D. Mo. Jan. 14, 2026) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) and *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012)).

(*Id.* ¶ 23, 26.) According to booking records, during the booking process, Decedent told Rash that he suffered from Congestive Heart Failure ("CHF"), did not have his medication, and needed medication for his heart problems. (*Id.* ¶ 29.) Rash noted on the booking form that Decedent needed medication for his heart problems; however, upon information and belief, Rash did not contact the shift supervisor about Decedent's CHF or obtain medical assistance for Decedent. (*Id.* ¶¶ 28, 30-31.) Neither Rash nor any other employee took Decedent's vital signs at any point during the booking process. (*Id.* ¶ 32.)

Around 3:00 am on January 16, William Kennedy and Lacie Grater – both Franklin County employees – brought Decedent from the booking area to a cell in general population, where he was housed with several other detainees. (*Id.* ¶ 35.) As Kennedy and Grater moved him, Decedent told them that he had CHF and had not received his medication. (*Id.* ¶ 36.) Kennedy claimed that he told two supervisors – Christopher Mesger and Luke Murray – that Hodge had CHF, did not have his medication, and had not seen a nurse. (*Id.* ¶ 37.) However, Kennedy, Grater, Mesger, and Murray did not take any steps to ensure that Decedent received medical attention. (*Id.*)

Christophe Poinsett, LPN, who was employed by Turn Key and/or Franklin County to provide medical services to inmates housed at the Franklin County jail and had a contractual duty to provide medical care for Decedent, was the only on-duty nurse working at the jail on January 16, 2024, and was the nurse solely responsible for providing medical care to Decedent and the other inmates. (*Id.* ¶ 17, 39-40.) Computer records show Turn Key and its employees, including nurse Poinsett, knew by 7:00 am on January 16 that Decedent suffered from CHF and needed his heart medication. (*Id.* ¶ 38.) Turn Key records also show that Decedent was given the highest medical priority, Level 1. (*Id.* ¶ 42.) Despite Decedent's reported condition, expressed lack of and need for medication, and high priority designation, Poinsett failed to see or treat Decedent at any

2

point on January 16. (*Id.* ¶ 43.) Poinsett and Turn Key had a duty to review the various medical issues of the inmates at the jail and to determine which inmates needed care most urgently; however, Poinsett evaluated the various medical needs of the inmates and chose not to treat Decedent on January 16. (*Id.* ¶¶ 44-45.) Poinsett also chose not to elevate this problem to one of his supervisors with greater medical experience who could have provided more medical advice about the severity of Decedent's situation. (*Id.* ¶ 46.) In the alternative, Poinsett did not review Decedent's booking information that noted that he had CHF and that he did not have his medication with him and thus was not aware of Decedent's CHF or lack of medication. (*Id.* ¶ 47.)

On the morning of January 16, one of Decedent's cellmates used the intercom to tell corrections officers that Decedent could not stay in the cell because of his difficulty breathing and loud snoring. (*Id.* ¶ 49.) Around 8:30 am on January 16, Franklin County employees Alex Lewis and Rash came to the cell to move Decedent. (*Id.* ¶ 50.) Decedent told them that he had CHF. (*Id.* ¶ 51.) Rash told Decedent that he was going to obtain medical assistance for him, but Lewis and Rash failed to tell anybody about his CHF or need for medical assistance. (*Id.* ¶¶ 51-52.) Instead, Lewis and Rash moved Decedent to another general population cell. (*Id.* ¶ 53.)

Throughout the day on January 16, Decedent lay in bed, weak. (*Id.* ¶ 54.) At one point, because of his labored breathing and snoring, his cellmates forced him to move outside of his cell. (*Id.*) He lay on the ground in the general area of the pod where he appeared visibly sick, as he was unable to carry his mattress, his hands were black in color because of poor circulation, and he made gurgling noises when he breathed. (*Id.* ¶¶ 54-55.) Another inmate told detention staff that Decedent needed medical help. (*Id.* ¶ 56.) That inmate told investigators that Decedent told Franklin County jail employee Matthew Johnson that he had CHF and had not received medication, but Johnson did not notify anyone of this information. (*Id.* ¶¶ 57-58.)

3

Around 11:00 pm on January 16, Decedent told Franklin County employees Patrick Martin,[3] Kennedy, Mesger, and Johnson that his cell mates kicked him out of the cell because of his medical issues. (*Id.* ¶ 59.) Despite this, none of these jail employees took any steps to provide Decedent with medical assistance, including by taking steps to notify Poinsett or Turn Key about his medical issues. (*Id.* ¶¶ 60-61.) In the alternative, Franklin County employees Rash, Kennedy, Grater, Mesger, Murray, Johnson, Martin, Lewis notified Turn Key and/or Poinsett about Decedent's foregoing medical issues, as well as his CHF and lack of medication, and Turn Key and/or Poinsett failed to take any actions to treat Decedent based upon that information. (*Id.* ¶ 62.) These jail employees moved Decedent to a medical cell where he would be by himself. (*Id.* ¶ 64.) Decedent looked physically weak, and Mesger carried his mattress for him as they moved cells. (*Id.* ¶ 63.)

After he was moved to the medical cell late on the evening of January 16, Decedent continued to languish without any medical care. (*Id.* ¶¶ 65-66.) At approximately 5:50 am on January 17, Decedent began to have a heart attack and struggled to call for help on the intercom. (*Id.* ¶ 67.) Franklin County officers responded to Decedent's cell, but they could not revive him. (*Id.* ¶ 68.) Plaintiffs allege that Decedent's cause of death was the named employees' failure to treat him or provide him his necessary medication for the 36 hours that he was in their custody and experiencing acute medical distress.[4] (*Id.* ¶ 70.) Decedent was never evaluated by a medical professional. (*Id.* ¶ 80.)

---

[3] In the "Parties" section of the Third Amended Complaint, Plaintiffs identify this defendant as Luke Martin. (ECF No. 39 at 3.) However, the caption of the Third Amended Complaint identifies this defendant as Patrick Martin (*Id.* at 1), the waiver of service identified him as Patrick (ECF Nos. 13-1,2), and the parties refer to him as Patrick in their briefing (ECF Nos. 41; 54).

[4] The Medical Examiner who conducted Decedent's autopsy concluded that he died because of "methamphetamine intoxication." (*Id.* ¶ 69.) Plaintiffs dispute this, contending that Decedent was screened for drugs upon entry to the jail and did not possess any, and that video

Plaintiffs filed this action pursuant to 42 U.S.C. § 1983 and Missouri state law, naming as Defendants Franklin County; Franklin County jail employees Rash, Kennedy, Mesger, Murray, Johnson, Martin, Lewis, and Grater (collectively, "Jail Employees"), all in their individual capacity; Turn Key; and Poinsett, in his individual capacity. (Am. Compl. ¶¶ 4-17.) Plaintiffs request compensatory and punitive damages, claiming as follows:

I.      Wrongful Death Medical Malpractice: Defendants Turn Key and Poinsett

II.     Wrongful Death: Defendant Rash

III.    Section 1983 Deliberate Indifference to Serious Medical Need: Defendants Jail Employees and Poinsett

IV.     Section 1983 Unconstitutional Custom and Failure to Train or Supervise: Defendants Turn Key and Franklin County

V.      Negligence: Defendant Poinsett (pleaded in the alternative to Count I)

(*Id.* at 11-34.) Defendants subsequently filed the instant motions to dismiss. (ECF Nos. 40, 46, 48.)

## **STANDARD OF REVIEW**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 556). Several principles guide the Court in determining whether a complaint meets the plausibility standard. The Court must take the plaintiff's factual allegations

---

shows the vast majority of his time in the jail, and at no point did Decedent ingest methamphetamine. (*Id.*) For purposes of this review, the Court accepts Plaintiffs' allegations as to cause of death as true. *See Miles*, 2026 WL 100573, at *3.

as true. *Iqbal*, 556 U.S. at 678. "This tenet does not apply, however, to legal conclusions or 'formulaic recitation of the elements of a cause of action'; such allegations may properly be set aside." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1056 (8th Cir. 2018) (citing *Iqbal*, 556 U.S. at 678). Rather, the facts alleged "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## DISCUSSION

### I.   FEDERAL CLAIMS

#### a.   Deliberate Indifference Claim (Count III)

Plaintiffs argue that the Jail Employees and Poinsett were all aware of Decedent's objectively serious medical condition but were deliberately indifferent when they failed to provide or obtain timely medical care for him. (Am. Compl. at 13-14.) The Jail Employees and Poinsett argue that Plaintiffs fail to state a claim against them, and the Jail Employees contend that they are entitled to qualified immunity. (ECF Nos. 41, 49.) The Court finds that, viewed in the light most favorable to Plaintiffs at this early stage in litigation, Plaintiffs allege sufficient facts to support a claim that the Jail Employees and Poinsett were deliberately indifferent to Decedent's serious medical needs, and the Jail Employees are not entitled to qualified immunity.

"It is well established that deliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." *Langford v. Norris*, 614 F.3d 445, 459 (8th Cir. 2010) (cleaned up) (quotation omitted). Claims of pretrial detainees are evaluated under Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. *Hartsfield v. Colburn*, 371 F.3d 454, 456-57 (8th Cir. 2004) (citing *Ervin v. Busby*,

6

992 F.2d 147, 150 (8th Cir. 1993)). But pretrial detainees are "entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment." *Id.* (citing *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 906 (8th Cir. 1999)). Thus, courts are to apply the deliberate indifference standard to a pretrial detainee's claims of inadequate medical care. *Id; see Davis v. Hall*, 992 F.2d 151, 152-53 (8th Cir. 1993) (per curiam). "This standard involves both objective and subjective analyses." *Troupe v. Young*, 143 F.4th 955, 968 (8th Cir. 2025) (citing *Hall v. Ramsey Cnty.*, 801 F.3d 912, 920 (8th Cir. 2015)). To meet the objective component, Plaintiffs must plead facts sufficient to demonstrate that Decedent "suffered from an objectively serious medical need." *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014). The subjective component requires Plaintiffs to plead facts sufficient to show that Defendants each subjectively knew of Decedent's serious medical need and deliberately disregarded that need. *Id.* "This showing requires a mental state akin to criminal recklessness." *Id.* (quotations omitted).

"A public official is entitled to qualified immunity unless: (1) their conduct violated a constitutional right, and (2) that right was clearly established." *Davis v. Buchanan Cnty.*, 11 F.4th 604, 623 (8th Cir. 2021). "Qualified immunity is appropriate where no reasonable fact finder could conclude that the facts when viewed in a light most favorable to the plaintiff show that the officers' conduct violated a clearly established constitutional right." *Id.* (quotation omitted). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (cleaned up) (quotation omitted).

Here, as to the objective component of the deliberate indifference claims against both the Jail Employees and Poinsett, Plaintiffs plead sufficient facts to demonstrate that Decedent suffered from an objectively serious medical need based on his CHF diagnosis, which required him to routinely take medication to prevent a heart attack. (Am. Compl. ¶ 24.) Moreover, neither the Jail

7

Employees nor Poinsett challenge that Decedent's CHF was an objectively serious medical need. Thus, the objective component is satisfied. *See Jackson*, 756 F.3d at 1065 ("To be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention.") (quotation omitted).

### i. Jail Employees

Turning to the subjective component, Plaintiffs sufficiently allege that the Jail Employees were deliberately indifferent, as they each knew that Decedent had CHF, needed his medication, had not received any medical attention, and/or was having worsening symptoms, but they all failed to take any steps to ensure that Decedent received medical care. As Plaintiffs specifically allege: Rash knew at booking, on the afternoon of January 15, that Decedent had CHF, did not have his medication, and needed medication for his heart problems; in the early morning of January 16, approximately 11 hours after booking, Kennedy and Grater knew of Decedent's CHF, his continued need for medication, and that he had not seen a nurse; Kennedy thereafter informed Mesger and Murray of this information; around 8:30 am on January 16, Lewis and Rash moved Decedent to a new cell after his cellmates reported his difficulty breathing and loud snoring, Decedent told Lewis and Rash that he had CHF, and Rash told Decedent that he was going to obtain medical assistance for him; throughout the day on January 16, Decedent lay in bed, weak; because of his labored breathing and snoring, his cellmates forced him to move outside of his cell, where he lay on the ground in the general area of the pod appearing visibly sick; Decedent told Johnson that he had CHF and had still not received his medication; and around 11:00 pm on January 16, Decedent told Martin, Kennedy, Mesger, and Johnson that his cellmates had kicked him out of his cell because of his medical issues. Plaintiffs further allege that, despite each of these

Defendants' awareness of Decedent's serious medical needs, none of the Jail Employees took any steps to notify medical staff or help obtain medical assistance for Decedent. Rather, they merely moved him cell-to-cell.

These facts demonstrate that each of the Jail Employees were aware of the substantial risk to Decedent's health if he did not receive heart medication to treat his CHF, yet they deliberately disregarded that risk by failing to notify medical staff or help obtain medical assistance for Decedent. Such inaction, where Jail Employees were aware of Decedent's heart condition and continued need for medication and treatment, was obviously inadequate. *See Coleman v. Rahija*, 114 F.3d 778, 786 (8th Cir. 1997) ("The factual determination that a prison official had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence or from the very fact that the risk was obvious." (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994))); *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016) (subjective component requires showing that the officer "actually knew" that the detainee "needed medical care and disregarded a known risk to [his] health"; mental state "can be inferred…from facts that demonstrate that a medical need was obvious and that the officer's response was 'obviously inadequate.'" (quoting *Thompson v. King,* 730 F.3d 742, 747 (8th Cir. 2013) ("[I]f a response to a known risk is obviously inadequate, this may lead to an inference that the officer recognized the inappropriateness of his conduct.""))); *see also Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 864 (8th Cir. 2006) ("[A] reasonable officer would consider chest pain and difficulty breathing to be symptoms that require medical attention in anyone who claims to have heart disease.").

In response, the Jail Employees argue that because Turn Key and Poinsett knew at 7:00 am that Decedent had CHF, needed medication, and was a Level 1 priority, the jail-personnel-

defendants were entitled to rely on Turn Key's determinations and evaluation of Decedent.[5] (ECF No. 41 at 10-12.) This argument is unpersuasive here because, unlike the cases cited by the Jail Employees where the inmate's complaints were known to the medical staff, Plaintiffs allege that Turn Key was not made aware of Decedent's worsening symptoms, need to repeatedly change cells due to medical issues, or continued need for medication. *See McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009) (finding it objectively unreasonable for jail official to rely on medical personnel's decisions, when the jail official had relevant knowledge about the inmate's condition that the medical personal did not have). Furthermore, Plaintiffs allege that some of these Defendants, including Rash, Kennedy, and Grater, knew of Decedent's condition and need for treatment before the information was reflected in Turn Key's system at 7:00 am, yet they did not notify any medical staff. Plaintiffs also alternatively allege that Poinsett was not even made aware of Decedent's booking information. Moreover, no medical provider physically examined Decedent or discussed his medical needs with him. The prison's contract with a medical provider does not remove the Jail Employees' constitutional duty to ensure that Decedent received necessary medical treatment when he specifically and repeatedly informed them of his condition and continued need for medication. *See Pritchett v. Griffe*, No. 4:19-cv-04084, 2020 WL 7222806, at *10 (W.D. Ark.

---

[5] The Jail Employees also challenge Plaintiffs' inconsistent allegations in support of alternative theories of liability under this claim (ECF No 56 at 6-8); however, a party may "set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones" and "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(2), (3). Though Plaintiffs "may have strained the bounds of this rule by alleging inconsistent facts and theories, it has not breached them. Rule 8(d) is meant to be applied liberally. Theories based on 'inconsistent and contradictory allegations in the pleadings' are 'recognized and indeed encouraged' by Rule 8(d)." *Modern Point, LLC v. ACU Dev., LLC*, No. 19-cv-0668 (NEB/HB), 2020 WL 13032696, at *9 (D. Minn. Oct. 22, 2020) (quoting *Garman v. Griffin*, 666 F.2d 1156, 1159 (8th Cir. 1981)). *See Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 536 (8th Cir. 1970) ("[U]nder the federal rules a claimant may plead inconsistent facts in support of alternative theories of recovery.").

May 27, 2020) ('Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished.' It follows that where the duty to furnish treatment is unfulfilled, contracting for services with an independent contractor…does not immunize county officials from liability for damages in failing to provide a prisoner with the opportunity for such treatment." (quoting *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989))). Accordingly, Plaintiffs' allegations sufficiently demonstrate the objective component of their deliberate indifference claim against each of the Jail Employees.

The Jail Employees next argue they are entitled to qualified immunity, as Plaintiffs fail to show that they violated his clearly established rights.[6] (ECF No. 41 at 10-12.) A reasonable factfinder could conclude that Plaintiffs' allegations show that the Jail Employees violated Decedent's clearly established right to receive medical treatment while detained, because every reasonable officer in each of the Jail Employees' positions would have understood that the failure to take any action to provide Decedent medical treatment violated his right to such care.[7] *See*

---

[6] The Court notes that the Jail Employees generally argue that qualified immunity applies to them because of their reliance on medical staff, but they do not address Plaintiffs' allegations in regard to each of the Jail Employees' specific knowledge and conduct. *See Bloodworth v. Kansas City Bd. of Police Comm'r*, 89 F.4th 614, 624 (8th Cir. 2023) ("[T]he doctrine of qualified immunity requires an individualized analysis of each officer's alleged conduct.") (quotation omitted). Nevertheless, the Court evaluates Plaintiffs' claims, and the application of qualified immunity, as to each of the Jail Employees, based on their individual knowledge and conduct. *Id.*

[7] Given that this case is in its preliminary stages, the Court notes that this decision does not prevent the Jail Employees from arguing for qualified immunity later in litigation. *See O'Meara for O'Meara v. Heineman*, No. 8:09CV157, 2010 WL 11527152, at *4 (D. Neb. Feb. 17, 2010) ("Because the first amended complaint does not establish immunity on its face, [the Court] will deny the motion to dismiss on the ground of qualified immunity. This does not, however, preclude a later motion for summary judgment reasserting qualified immunity."); *Estate of Wondercheck ex rel. Wondercheck v. Nebraska*, No. 4:06CV3087, 2006 WL 2010216, at *3 (D. Neb. July 14, 2006) (denying motion to dismiss based on qualified immunity without prejudice to reassertion in properly supported motion for summary judgment); *Cronin v. Peterson*, 288 F. Supp. 3d 970, 986 (D. Neb. 2018).

11

*McRaven*, 577 F.3d at 980 (8th Cir. 2009) ("A detainee's right to medical treatment is clearly established"); *Langford*, 614 F.3d at 460 ("Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished."); *Schaub v. VonWald*, 638 F.3d 905, 918 n.6 (8th Cir. 2011) (recognizing the "well-established proposition" that although "prison officials are not doctors…when personally confronted with the serious medical needs of a prisoner, prison officials cannot be deliberately indifferent to those needs by inaction.").[8]

Thus, Franklin County's Motion to Dismiss (ECF No. 40) is denied as to Plaintiffs' deliberate indifference claim against the Jail Employees.

### ii. Poinsett

Plaintiffs also plead sufficient facts to show that Poinsett was deliberately indifferent, as they allege that he knew of Decedent's serious medical need, yet deliberately disregarded that need by failing to examine or provide medication to Decedent. Poinsett argues that Plaintiffs' factual allegations fail to meet the subjective component of the deliberate indifference standard because Poinsett was not made aware of Decedent's worsening symptoms on January 16, and without knowing that information, Poinsett's failure to assess Decedent that day amounted at most to

---

[8] *See also Dadd v. Anoka Cnty.*, 827 F.3d 749, 753-54 (8th Cir. 2016) (affirming denial of motion to dismiss based on qualified immunity where claimant alleged that prison officials were aware of detainee's serious medical need, level of pain, and need for medication, but prison officials ignored his requests for help or treatment); *Troupe*, 143 F.4th at 971 (finding correctional officer defendants were not entitled to qualified immunity at pleading stage where they took no action to assess or address inmate's obviously worsening condition); *Presson v. Reed*, 65 F.4th 357, 366 (8th Cir. 2023) (finding deliberate indifference claim resting on misadministration and withholding of prescription medication was supported where defendants knew of plaintiff's need for medication but refused care); *Gordon*, 454 F.3d at 864 (finding intentional delay by corrections officer showed deliberate disregard sufficient to reject qualified immunity, where officer knew of inmate's heart failure, high blood pressure, chest pain, and difficulty breathing, and took no action to provide medical care); *Plemmons v. Roberts*, 439 F.3d 818, 825 (8th Cir. 2006) (finding reasonable officer would have known that a delay in providing prompt, appropriate medical care to inmate violated 8th Amendment where inmate told prison officials that he was a heart patient, began having classic heart attack symptoms, and repeatedly asked for help).

negligence. (ECF No. 49 at 8-10.) While Plaintiffs allege that the Jail Employees did not inform Turn Key or Poinsett of Decedent's worsening symptoms, Plaintiffs plead in the alternative that the Jail Employees notified Turn Key and/or Poinsett about Decedent's worsening symptoms. Poinsett argues that Plaintiffs' allegation that he was aware of Decedent's worsening condition is conclusory and fails to sufficiently plead an alternative theory of liability. (ECF No. 57 at 2.) However, Plaintiffs represent that the specific facts showing who communicated with Poinsett and when this communication occurred are not in their possession at this stage in litigation (ECF No. 52 at 6); and Plaintiffs' allegation supporting their alternative legal theory is permissible under Fed. R. Civ. P. 8(d), *see supra* n.5. Moreover, when reading the pleading as a whole, the Court finds the allegation sufficiently detailed to alternatively show that the Jail Employees notified Poinsett of Decedent's worsening symptoms while he was on duty on January 16. *See Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 795 (8th Cir. 2021) (at the motion to dismiss stage, complaints should be construed liberally and read as a whole).

Regardless, even without considering the alternative allegation that Poinsett was aware of Decedent's worsening symptoms, Plaintiffs adequately plead facts showing Poinsett's deliberate indifference. Poinsett argues that he was unaware of Decedent's serious medical needs because, at most, he knew that Decedent had CHF; and it is unreasonable to assume that every patient with CHF requires urgent or emergency evaluation in all cases or faces an imminent risk of death. (ECF No. 49 at 8-10.) This argument is unpersuasive because Plaintiffs demonstrate that Poinsett had more information than merely Decedent's diagnosis. Plaintiffs specifically allege that: at 7:00am on January 16, Poinsett was aware that Decedent had CHF, needed his medication, and was designated the highest medical priority; Poinsett was the only on-duty nurse working at the jail on January 16; and Poinsett reviewed Decedent's medical records and chose not to treat him or elevate

13

treatment to one of his supervisors at any point on January 16. These facts demonstrate that Poinsett was aware of the substantial risk of harm to Decedent if untreated and chose to ignore that risk by not examining Decedent or providing his heart medication on January 16, even though he was the sole nurse on duty. *See Coleman*, 114 F.3d at 786; *Barton*, 820 F.3d at 965. Contrary to Poinsett's argument, ignoring such a medical need, while being the only on-duty nurse, amounts to more than mere negligence. *See Vaughan v. Lacey*, 49 F.3d 1344, 1345 (8th Cir. 1995) (deliberate indifference includes intentional refusal to provide medical care); *Benter v. Peck*, 825 F.Supp. 1411, 1417 (S.D. Iowa 1993) ("Courts have consistently held that the knowledge of the need for medical care and the intentional refusal to provide that care are more than negligence and constitute deliberate indifference." (citing *Robinson v. Moreland*, 655 F.2d 887, 890 (8th Cir. 1981))); *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006) ("[T]he knowing failure to administer prescribed medicine can itself constitute deliberate indifference."); *Starks v. St. Louis Cnty.*, 159 F.4th 1146, 1150 (8th Cir. 2025) (acknowledging that courts have "found withholding medication to be deliberate indifference" in cases that "involved actual knowledge of the inmate's serious medical need and needed medication was intentionally withheld.").

The cases cited by Poinsett are also unpersuasive. In *Rotham v. Lombardi*, No. 4:11-CV-639 CEJ, 2013 WL 4855301, at *3 (E.D. Mo. Sept. 11, 2013), the Court found a prison official did not violate an inmate's Constitutional rights where the prisoner only notified the official of his need for restrictions, but not the nature or severity of his medical condition. The Court reasoned that "[i]t would be unreasonable to assume that a prison official would be aware of the existence or severity of a medical condition" where the inmate requested restrictions without "identify[ing] or describe[ing] the reasons for the restrictions"; and disregarding a prescription "cannot constitute deliberate indifference when the prison official has little or no information regarding the inmate's

14

condition." *Id.* Here, Poinsett certainly had more than "little or no information" regarding Decedent's condition and was not merely aware of Decedent's need for medication, as he was also aware that the medication was treatment for Decedent's CHF and that Decedent was the highest medical priority. Based on this knowledge, it would be unreasonable to assume that Poinsett was unaware of the nature or severity of Decedent's medical condition when he chose not to provide medical care on January 16. Poinsett also argues that this case is similar to *Troupe*, 143 F.4th at 968-69, where the Court of Appeals affirmed the district court's decision to dismiss the plaintiff's allegations against a nurse defendant because the only allegation against him was that he "began doing rounds on his shift" on the night the decedent perished. Here, Plaintiffs allege much more, asserting not only that Poinsett was on duty on January 16, but also that he was the only nurse on duty; he knew that Decedent had CHF, needed his medication, and was the highest medical priority; and despite these facts, he chose not to offer or provide treatment.

For all of these reasons, this Court finds that Plaintiffs have pleaded sufficient facts to show that Poinsett knew of Decedent's serious medical need and deliberately disregarded that need. Consideration of the alternatively pleaded fact that Poinsett also had knowledge of Decedent's worsening symptoms further supports this conclusion.

Thus, Poinsett's Motion to Dismiss (ECF No. 48) is denied as to Plaintiffs' deliberate indifference claim against him.

### b.  *Monell* **Claim (Count IV)**

Plaintiffs claim that Franklin County and Turn Key's collective abdication of policymaking and oversight responsibilities and/or its inadequate policies, procedures, customs, practices, and actions, as well as its inadequate training and supervision, resulted in a violation of Decedent's constitutional rights. (Am. Compl. ¶ 116.) Plaintiffs more specifically allege the following

15

"systemic deficiencies": defendants failed to implement policies to provide newly arrived inmates with a medical screening and their needed prescription medication; defendants failed to implement a method to train employees to recognize and report serious medical issues; defendants failed to note urgent conditions or conditions that necessitate regular assessment, monitoring, and follow-up; defendants failed to establish a method to provide medical care or observation on people who are booked in the "medical wing"; delays or non-responses to noted urgent conditions; delegated clinical determinations to nursing personnel, who are neither qualified nor licensed to independently make such determinations; poor quality nursing, including failing to note urgencies and conditions requiring further evaluation and treatment, schedule follow-up appointments for on-site care or off-site specialty care, and collect past medical records from prior treating physicians; failed to provide continuity of care by not documenting clinical observations, not properly diagnosing medical conditions, not providing adequate treatment, and not providing the care ordered by off-site treating physicians; utilized "conservative" treatment methodologies unless or until a medical condition becomes emergent, in contravention of prevailing medical practices; belated or untimely authorized off-site specialty medical care and treatment; and failed to provide inmates with qualified medical opinions rendered by on-site and off-site physicians. (*Id.* ¶ 117.) Plaintiffs also describe over twenty prior incidents where jailed individuals have died while under Turn Key's care and allege that the common thread in these cases is that Turn Key has a policy, practice, or widespread custom of (1) purposefully denying inmates timely access to emergency medical treatment from a qualified medical provider for obvious medical emergencies; (2) severe understaffing; (3) and failing to train and supervise nurses and medical providers to provide timely access to emergency medical treatment for medical emergencies, then failing to

16

retrain or discipline Turn Key employees for not providing timely access to qualified medical providers. (Am. Compl. ¶¶ 113-38.)

A local governing body, such as Franklin County, and its contracted medical provider, such as Turn Key, can be sued directly under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Kingsley v. Lawrence Cnty.*, 964 F.3d 690 (8th Cir. 2020) (involving § 1983 claim against county); *Ervin v. Pulaski Cnty.*, No. 4:23-cv-00185 KGB, 2024 WL 1347037, at *2 (E.D. Ark. Mar. 29, 2024) (involving § 1983 claim against Turn Key under *Monell* theory of liability (citing *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-976 (8th Cir. 1993) ("[A] corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies."))). "Under *Monell's* holding a municipal entity is liable under § 1983 only if a municipal 'policy or custom' caused a plaintiff to be deprived of a federal right." *L.A. Cnty. v. Humphries*, 562 U.S. 29, 32-33 (2010). "Such liability may attach if the constitutional violation 'resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise.'" *Cox v. Walker*, No. 4:19-CV-02764-RLW, 2019 WL 6525600, at *3 (E.D. Mo. Dec. 4, 2019) (quoting *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018)); *see Marsh v. Phelps Cnty.*, 902 F.3d 745, 751 (8th Cir. 2018) (recognizing "claims challenging an unconstitutional policy or custom, or those based on a theory of inadequate training, which is an extension of the same"). "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). To establish liability based on an unofficial custom, a plaintiff must show "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after

17

notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014). On a failure-to-train theory, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference...." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

### i.  Franklin County

Franklin County argues that it is entitled to dismissal of the *Monell* claim because Plaintiffs have failed to plausibly allege an underlying constitutional violation, and in the alternative, Plaintiffs' claim for relief regarding punitive damages under this count should be dismissed due to municipality-immunity. (ECF Nos. 41 at 12-13; 56 at 9.) Plaintiffs argue that they have plausibly alleged a constitutional violation through their deliberate indifference claim against Jail Employees, but they do not respond to the immunity argument. (ECF No. 54 at 8-9.)

While it is true that "absent a constitutional violation by a [county] employee, there can be no § 1983 or *Monell* liability for the [county]," *Jones v. Faulkner Cnty.*, 131 F.4th 869, 876 (8th Cir. 2025) (citations and quotation omitted), Plaintiffs adequately allege an underlying constitutional violation against Franklin County employees, namely Jail Employees, to support their *Monell* claim against Franklin County. *See supra* section I(a)(i). As a result, Franklin County's argument that Plaintiffs' *Monell* claim should be dismissed for lack of an underlying constitutional violation fails.

Turning to Franklin County's immunity argument, "[i]t is well established that punitive damages are not available against a municipality in a § 1983 action." *Ilsemann v. St. Charles Cnty.*, No. 4:23-CV-138-SPM, 2023 WL 4488354, at *1 (E.D. Mo. July 12, 2023) (citing *City of Newport*

*v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)). As reasoned by the Supreme Court, punitive damages are intended "to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct," and "an award of punitive damages against a municipality 'punishes' only the taxpayers, who took no part in the commission of the tort." *City of Newport*, 453 U.S. at 266-67. Based on this caselaw, the Court agrees that Franklin County is entitled to immunity from punitive damages as to this claim. *See Ilsemann*, 2023 WL 4488354, at *2 (applying *City of Newport* to counties).

Thus, regarding Plaintiffs' *Monell* claim, Franklin County's Motion to Dismiss (ECF No. 40) is granted as to the request for punitive damages and is otherwise denied.

### ii. Turn Key

Turn Key argues that Plaintiffs' *Monell* claim fails because they fail to allege facts showing that a policy, practice, or custom was the moving force of the constitutional violation alleged here. (ECF Nos. 47 at 15-17.) This Court finds that Plaintiffs state a plausible claim for *Monell* liability against Turn Key, as they adequately allege facts to support the reasonable inference that Turn Key's inadequate policies and customs caused Decedent to suffer a constitutional injury. *See L.A. Cnty.*, 562 U.S. at 32-33; *see also Watkins v. City of St. Louis*, 102 F.4th 947, 951 (8th Cir. 2024) ("A claim is facially plausible when the pleaded facts permit the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (quotations and citations omitted). For example, Plaintiffs allege Turn Key's failure to implement policies to provide newly arrived inmates with a medical screening and necessary prescription medication, were the moving force behind Decedent's injuries because these systemic failures "operated to deprive [him] of the right to adequate and appropriate diagnosis and treatment of his serious medical needs, and, but for the same, he would not have been deprived of rights secured by the Fourteenth Amendment."

19

(Am. Compl. ¶¶ 117a, 107[9].) Indeed, Plaintiffs allege that Decedent communicated his serious medical condition and need for medication at booking and Turn Key/Poinsett had knowledge of Decedent's need for treatment and high priority level early the next morning, yet Decedent was never screened, treated, or provided his medication during his 36-hour detainment. (*Id.* ¶¶ 29, 32, 34, 38.) Plaintiffs also allege that had Decedent been evaluated upon his arrival to the facility, Turn Key employees would have at least been aware of his vitals, medications, and history of chronic illness at booking, which would have notified them of Decedent's dire medical situation earlier in his detainment. (*Id.* ¶¶ 78-81.) Related to their argument for understaffing, Plaintiffs allege that Poinsett was the only on-duty nurse on January 16 and argue that Poinsett's failure to see and treat Decedent was a direct result of Turn Key's policy and custom of understaffing; that is, Plaintiffs assert that but-for this systemic shortcoming, Poinsett would have provided Decedent with adequate and prompt medical care, preventing his death. (*Id.* ¶¶ 40, 138-40.) Considering all of these allegations together and in the light most favorable to Plaintiffs, Plaintiffs sufficiently allege a *Monell* claim against Turn Key. *See Warmington*, 998 F.3d at 795; *see also Blackwell v. Corizon Health Care*, No. 1:21-CV-176-AGF, 2022 WL 832323, at *1-2 (E.D. Mo. Mar. 21, 2022) (finding plaintiff sufficiently stated a *Monell* claim against medical provider where plaintiff alleged he suffered constitutional harm due to medical provider's policy to deny or delay care, as well as staffing deficiencies that contributed to these denials and/or delays).

Turn Key further argues that Plaintiffs fail to: allege an underlying substantive claim (ECF No. 55 at 3); show a pattern of misconduct (ECF No. 47 at 17-18); or allege facts showing inadequate training and supervision (*Id.* at 18-20). As this Court found above, Plaintiffs sufficiently

---

[9] Plaintiffs' pleading is misnumbered and contains two paragraphs 107. This citation is to paragraph 107 located on page 18.

alleged an underlying substantive claim against Poinsett. *See supra* section I(a)(ii). Plaintiffs also sufficiently alleged a pattern of misconduct to survive dismissal at this time. Not only do Plaintiffs allege prior instances of deaths due to inadequate or lack of medical care, but they also set forth common threads in these other cases – threads that directly relate to the policies, customs, and failure to train that Plaintiffs allege led to Decedent's constitutional injury. (Am. Compl. ¶¶ 113-36, 138-40.) Moreover, Plaintiffs allege that Turn Key was aware of each of the prior instances, including an incident in the same facility months before Decedent's death that did not result in any re-training. (*Id.* ¶¶ 112-13, 136-40.) Finally, the Court holds that Plaintiffs state a claim for failure to train or supervise, as they allege facts plausibly suggesting that Franklin County/Turn Key (1) had inadequate training practices on identifying serious medical issues like CHF; (2) were "deliberately indifferent to the rights of others in adopting these training practices, and" their "failure to train was a result of deliberate and conscious choices," based on the allegations of Turn Key's prior instances of failing to identify serious medical issues; (3) and the "alleged training deficiencies caused [Decedent's] constitutional deprivation." *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1061 (8th Cir. 2013).

Thus, Turn Key's Motion to Dismiss (ECF No. 46) is denied as to Plaintiffs' *Monell* claim.

## II.     STATE CLAIMS

### a.  Wrongful Death Medical Malpractice (Count I) and Negligence (Count V)

Turn Key argues that this Court should decline to exercise supplemental jurisdiction over Plaintiffs' wrongful death and negligence claims, as the Court has discretion to do so when all of the federal claims have been dismissed. (ECF No. 47 at 15-16.) Because this Court has not dismissed the federal claims, which are so related to the state claims such that the claims are part of the same case or controversy, the Court rejects Turn Key's argument and exercises supplemental jurisdiction over these state law claims. *See* 28 U.S.C. § 1367(a), (c); *Hunter v. Page Cnty.*, 102

21

F.4th 853, 870 (8th Cir. 2024) (listing factors to consider in determining whether to exercise supplemental jurisdiction).

Turn Key and Poinsett next contend that Plaintiffs fail to state a claim for wrongful death based on medical malpractice, as they do not demonstrate that Poinsett and Decedent formed a nurse-patient relationship or that Poinsett owed any duty of care to Decedent. (ECF Nos. 47 at 16-17; 49 at 3-8.) Turn Key further argues that even if a nurse-patient relationship existed, Plaintiffs failed to state a malpractice or negligence claim, as they do not allege that Poinsett breached his duty or that any breach caused Decedent's death. (ECF No. 47 at 17-18.) For the following reasons, this Court finds that Plaintiffs have sufficiently pleaded their state law negligence claims.

"In order for a plaintiff to make a submissible negligence claim, he must prove the following: (1) the existence of a duty to be performed by the defendant; (2) a breach of that duty; and (3) a resulting injury caused by the breach." *Brown v. Bailey*, 210 S.W.3d 397, 404 (Mo. App. E.D. 2006) (citing *Ladish v. Gordon*, 879 S.W.2d 623, 628 (Mo. App. W.D. 1994)); *Coonce v. Simons*, 520 S.W.3d 821, 824 (Mo. App. S.D. 2017) (citing *Sundermeyer v. SSM Reg'l Health Servs.*, 271 S.W.3d 552, 554 (Mo. banc 2008)) (similarly, for wrongful death based on medical malpractice, plaintiff must show "(1) the defendant's act or omission failed to meet the required medical standard of care; (2) the defendant's act or omission was negligently performed; and (3) the defendant's act or omission caused the decedent's death."). "A plaintiff can pursue a negligence cause of action against a defendant-[health care provider] in two ways: (1) a claim based on medical negligence, also referred to as "medical malpractice," and/or (2) a claim based on general negligence." *Brown*, 210 S.W.3d at 404 (citing *Millard v. Corrado*, 14 S.W.3d 42, 49, 52 (Mo. App. E.D. 1999) (finding that the plaintiffs in that case adequately pleaded both a medical negligence claim and a general negligence claim against the defendant-physician); *Devitre v.*

*Orthopedic Center of St. Louis,* 349 S.W.3d 327, 332 n. 4 (Mo. banc 2011) (noting that medical malpractice claims may be brought against any "health care provider" including physicians and nurses).

"For a claim based on medical negligence, a [health care provider's] duty to a plaintiff is derived from a [health care provider]-patient relationship. Such a relationship is essential to a claim for medical negligence." *Brown*, 210 S.W.3d at 404 (citing *Millard*, 14 S.W.3d at 46-49). "A nurse-patient relationship and duty of care arises when the patient knowingly employs the nurse and the nurse knowingly consents to treat the patient." *Huelskamp v. Patients First Health Care*, 475 S.W.3d 162, 174 (Mo. App. E.D. 2014) (citation omitted). "Where a consulting [health care provider] does not physically examine or bill the patient, a [health care provider]-patient relationship can still arise where the [health care provider] is contractually obligated to provide assistance in the patient's diagnosis or treatment and does so." *Lowe v. Mercy Clinic East Communities*, 592 S.W.3d 10, 19-20 (Mo. App. E.D. 2019) (citing *Corbet v. McKinney*, 980 S.W.2d 166, 169 (Mo. App. E.D. 1998).

"[F]or a claim based on general negligence, a [health care provider's] duty to a plaintiff may exist when public policy favors the recognition of a duty or when the harm to the patient is particularly foreseeable. Thus, a [health care provider]-patient relationship is not necessary for a claim for general negligence." *Brown*, 210 S.W.3d at 404 (citing *Millard*, 14 S.W.3d at 46-49). "Under Missouri law, 'foreseeability alone is not enough to establish a duty…there must also be some right or obligation to control the activity which presents the danger of injury.'" *Graw v. Eli Lilly*, 821 F.Supp.3d 981, 991 (E.D. Mo. 2026) (quoting *Stitt by Stitt v. Raytown Sports Ass'n,*, 961 S.W.2d 927, 930 (Mo. App. 1998)).

23

As to the issue of duty, this Court finds that Plaintiffs have pleaded sufficient facts to support a reasonable inference that Poinsett and Decedent had a nurse-patient relationship, despite the fact that Poinsett did not physically examine Decedent. *See Lowe*, 592 S.W.3d at 19-20. Plaintiffs specifically allege that Poinsett was contractually obligated to provide medical services to inmates housed at the jail, including Decedent. (Am. Compl. ¶ 17, 39, 85.) *See Corbet*, 980 S.W.2d at 169-70; *Lowe*, 592 S.W.3d at 19-20; *see also Smith v. Lisenbe*, No. 4:20 CV 804 JMB, 2022 WL 407142, at *14 (E.D. Mo. Feb. 10, 2022) (noting that medical provider at jail was contractually obligated to provide medical care to inmates). Thus, whether a nurse-patient relationship existed depends on whether Plaintiffs sufficiently allege that Poinsett undertook to provide assistance in Decedent's diagnosis or treatment, even if he never physically examined Decedent. Plaintiffs argue that Poinsett, as the sole nurse responsible for caring for Decedent, took steps to provide assistance in Decedent's treatment by reviewing his medical information – which indicated that Decedent had CHF, needed medication, and was the highest medical priority – and choosing not to examine him, provide medication or treatment, or elevate his care to a supervisor. Plaintiffs cite Missouri cases involving on-call emergency room ("ER") doctors (ECF No. 53 at 3-7); however, Defendants contend that these cases are distinguishable from the instant facts because Poinsett never took any action to begin Decedent's treatment (ECF No. 49 at 4-8).

Missouri Courts have repeatedly found that a physician-patient relationship can exist, without a physical examination or visit, when on-call physicians in ERs, who have a contractual obligation to provide services to ER patients, undertake any action to begin treating the patient. *See, e.g.*, *Millard*, 14 S.W.3d at 44, 49-52 (finding material issue of fact as to whether on-call surgeon participated in patient's treatment where on-call surgeon, who was not physically present at the ER and was the only available general surgeon, called the ER in response to two missed

24

pages and discussed the situation and options with the treating physician); *Lowe*, 592 S.W.3d at 19-20 (finding that on-call ER physician was contractually obligated to participate in patient's diagnosis and treatment and undertook to do so by providing treatment input to the attending physician). Comparing these cases to the facts here, the Court finds that Poinsett is similar to the on-call ER physicians, as he was the sole nurse responsible for providing medical care to Decedent at the jail on January 16, and he had a contractual obligation to participate in Decedent's care. *See Millard*, 14 S.W.3d at 51; *Lowe*, 592 S.W.3d at 20. Notably, unlike the physicians in these cases who were not physically present at the ERs, Plaintiffs do not allege that Poinsett was not physically present at the jail throughout his duty shift on January 16. The Court also finds that Poinsett's review of Decedent's medical records is similar to the on-call ER physicians' discussion of the records with other medical staff. *See id.* That said, in both *Millard* and *Lowe*, the on-call physicians not only reviewed or discussed the records, but also discussed or recommended treatment options. *See id.* Here, Poinsett did not discuss or recommend treatment options but chose not to provide treatment after his review of Decedent's records. A recent decision from the Missouri Court of Appeals, however, is instructive on this issue. *See Knight v. Li*, 709 S.W.3d 383, 392-93 (Mo. App. E.D. 2025), *transfer denied* (Apr. 29, 2025).

In *Knight*, the decedent arrived at the ER, where the ER doctor diagnosed him with CHF and ER staff contacted a medical group contracted to provide cardiology consultations to the hospital. *Id.* at 385-86. ER staff spoke with a nurse practitioner, who was a member of the medical group, and, at that time, the nurse practitioner accepted the decedent on behalf of the consulting cardiology physician. *Id.* at 386. The nurse practitioner subsequently reviewed the decedent's records and apparently took no further action in his care. *Id.* The decedent suffered a cardiac arrest and died before the consulting physician ever saw him. *Id.* The Court of Appeals found that,

25

> Whether a physician-patient relationship existed here is entirely dependent on whether [the nurse practitioner's] express acceptance of [the d]ecedent as a patient on behalf of [the consulting physician] or as an agent of [the medical group], and *her subsequent review of [the d]ecedent's medical records*, satisfied the requirement set by *Corbet* and *Lowe* that physician-patient relationships may exist where the physician consents to treat the patient *or* where a physician is contractually obligated to provide assistance in the patient's diagnosis or treatment and does so, in that the relationship here was purportedly consented to by [the nurse practitioner] *and the treatment process subsequently begun*, although cut short by [the d]ecedent's death.

*Id.* at 393 (emphasis added). The Court of Appeals concluded that "this determination involves material questions of fact regarding whether a physician-patient relationship was established either by consent or by contract and treatment, which are solely reserved for the fact finder and are improper for summary judgment." *Id.* (emphasis added)

These findings, and their contemplation of establishing a physician-patient relationship, either by consent or by contract and treatment, based on the nurse practitioner's consent and subsequent record review, indicate that the nurse practitioner's review of the medical records – apparently the only action she took in the treatment process – was enough to have begun the treatment process and thus supported that the consultant-physician undertook to participate in the decedent's treatment. Therefore, this Court interprets the decision in *Knight* to suggest that a physician's review of a patient's records and subsequent inaction, when they are contractually obligated to provide care for that patient, can show that the physician undertook to participate in the patient's diagnosis or treatment. Thus, Plaintiffs' allegation that Poinsett reviewed Decedent's medical records and chose not to personally examine him, provide medication, or elevate the issue to a supervisor, sufficiently demonstrates that Poinsett began participating in Decedent's treatment, even though there was no express consent like in *Knight*. Moreover, unlike in *Knight* where the consultation was not identified as being urgent, *id.*, Decedent's records reflected that he was the highest medical priority (Am. Compl. ¶¶ 42-43). Further, in this case, Poinsett himself, not another

26

health care provider on his behalf, personally reviewed the medical records. For all these reasons, the Court finds Plaintiffs adequately plead the existence of a duty, through the nurse-patient relationship between Poinsett and Decedent, to support their medical malpractice claim.

Even if Plaintiffs failed to allege a duty for their malpractice claim, they alternatively allege that Poinsett had a duty under a theory of general negligence; and Defendants present no argument, outside of their challenge to the existence of a nurse-patient relationship, regarding Poinsett's duty under the general negligence claim. *See Millard*, 14 S.W.3d at 47 ("[W]hen the physician's allegedly negligent acts or omissions do not involve a matter of medical science, a duty may also exist when public policy favors the recognition of a duty or when the harm is particularly foreseeable.").

As to the issue of breach, Turn Key argues that, pursuant to the Missouri Core Jail Standard, Turn Key had 14 days to complete Decedent's intake health appraisal. They further contend that although Decedent was marked as "high priority," Poinsett was not aware of Decedents' requests for care or change in condition, such that the standard of care would have required him to emergently see Decedent for immediate evaluation and/or care. (ECF No. 47 at 22.) Plaintiffs contend that consideration of the Missouri Core Jail Standard is inappropriate at this stage, as it is outside the pleadings. (ECF No. 52 at 10.) This Court need not consider these standards at this stage, as Plaintiffs' pleading alleges breach not only for Poinsett and Turn Key's failure to conduct an initial medical screening, but also their failure to provide Decedent access to medication, provide care for his diagnosed and known CHF, or address his medical distress. To be sure, the Court disagrees with Turn Key's argument that Poinsett was unaware of any urgent need to see Decedent, or at least a need to see him sooner than 14 days after booking, as Plaintiffs allege that Poinsett had knowledge regarding Decedent's diagnosis, continued requests for medication,

27

worsening symptoms, and that he was the *highest medical priority*. Such allegations are sufficient to plausibly show that Poinsett and Turn Key were aware of Decedent's need for care, and failing to provide care or elevate the issue to a supervisor on January 16 was a breach of that duty.

As to causation, Turn Key argues that Plaintiffs fail to allege that but-for Poinsett's breach, Decedent would not have died; and that the Jail Employees' failure to notify Poinsett of Decedent's continued need for care and worsening symptoms was an intervening act breaking causation. (ECF No. 47 at 22.) This Court disagrees, and finds that Plaintiffs plausibly allege but-causation, as their pleading alleges that Decedent died as both a direct and proximate result of Poinsett's failure to provide care and sets forth sufficient facts, taken as true, to demonstrate that had Poinsett – the sole on-duty nurse – examined and provided Decedent with medical care on January 16, namely his CHF medication, he would not have had a heart attack and died. (Am. Compl. ¶¶ 24-25, 34, 38-43, 80, 81, 88). *See Vogt v. Progressive Casualty Ins. Co.*, 4:22-cv-00385-SRC, 2024 WL 1140932, at *6 (Mo. E.D. Mar. 14, 2024) (explaining that but-for causation tests for causation in fact, and proof of causation entails proof of causation in fact as well as proximate causation) (citations omitted). Moreover, Plaintiffs alternatively plead that the Jail Employees notified Poinsett of Decedent's continued need for medication and worsening symptoms, undercutting Turn Key's intervening act argument.

Thus, Poinsett's and Turn Key's Motions to Dismiss (ECF Nos. 46; 48) are denied as to Plaintiffs' state law negligence claims.

### b. Wrongful Death (Count II)

Rash contends that he is entitled to dismissal of this claim because he is protected by official immunity, as Plaintiffs fail to show he had a ministerial duty to contact a supervisor. (ECF Nos. 41 at 3-8; 56 at 2-3.) He further argues that Plaintiffs fail to plausibly allege malice or bad

faith to circumvent immunity, and they fail to sufficiently tie Rash's conduct to Decedent's injury and death. (ECF No. 41 at 6-8; 56 at 3-5.) Plaintiffs argue and allege that Rash had a ministerial duty because jail policy requires deputies conducting the booking process to answer simple yes or no questions with the newly arrived detainees in order to determine whether they have basic medical problems; and if the arrestee answers "yes" on any of the intake questions, the deputy is mandated to contact the shift supervisor whose job is to determine if emergency services should be called. (Am. Compl. ¶ 27; ECF No. 54 at 4-5.) In its reply, Franklin County attached the intake form that Rash filled out upon Decedent's booking, reflecting that Rash circled "yes" on the questions asking if Decadent took any medication, had a history of heart problems, and had any additional medical information or concerns. (ECF No. 56-2.) There were also handwritten notes alongside these questions, indicating that Decedent took blood pressure medication and a heart pill, had "CHS," and needed medication for his heart problem. (*Id.*) Franklin County also attached a copy of the applicable jail policy, which provides in relevant part as follows:

> F. FIT FOR CONFINEMENT- The deputy conducting the booking process will make the determination as to the arrestee's general health. "A QUICK VISUAL OBSERVATION SHOULD BE CONDUCTED BY THE BOOKING OFFICER DURING THE SEARCH PROCESS AND WHILE PLACING THE ARRESTEE IN THE HOLDING CELL" THE BOOKING OFFICER WILL CHECK FOR THE FOLLOWING:
> 1. Are there obvious injuries?
> 2. Does the arrestee suffer from a serious or chronic illness?
> 3. If the deputy conducting the booking observes either #1 or #2 above, the shift supervisor will be notified and will determine if Emergency Medical Services (EMS) should be called to further evaluate a situation or condition.
> ….

(ECF No. 56-1 at 4.)[10]

---

[10] In Franklin County's memorandum supporting its motion to dismiss, it mistakenly responded to Plaintiffs' allegations as raised in a previous pleading. (ECF No. 41 at 3.) In their response to the motion to dismiss, Plaintiffs explained that they incorrectly indicated the changes made in their amended pleading (related to recognizing a "yes" designation) and attached the corrected version. (ECF No. 54 at 4 n.1) Plaintiffs consented to Rash amending the Motion to

29

The Court finds that the intake form and jail policy are properly before this Court at this stage in litigation, as they are embraced by the pleading, and no party challenges their relevancy or authenticity. *See Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1150-51 (8th Cir. 2012) (documents are necessarily embraced by the pleading and are thus properly considered in deciding a motion to dismiss, when their contents are alleged in a complaint and no party questions their authenticity). Even though Plaintiffs allege that jail policy mandates the deputy to contact the shift supervisor simply if the arrestee answers "yes" to any of the intake health questions, the policy clearly provides, in relevant part, that, at booking the deputy is to "make the determination as to the arrestee's general health"; conduct a "quick visual observation"; and "check" if the "arrestee suffers from a serious or chronic illness." (ECF No. 56-1 at 4.) If the deputy "observes" that the arrestee suffers from a serious or chronic illness, he or she must notify the shift supervisor. (*Id.*) Thus, the Court considers the policy as it is set forth in the attachment. *See Holmbeck v. Solomon*, 639 F. Supp. 3d 829, 833 n.2 (E.D. Ark. 2022) ("In the event there are any clear inconsistencies between an allegation in the…[c]omplaint and a document embraced by the…[c]omplaint, the document controls." (citing *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017))); *Williams v. First Nat. Bank*, No. 4:14-CV-1458-ERW, 2014 WL 5800199, at *4 (E.D. Mo. Nov. 7, 2014) ("Courts need not accept as true factual assertions that are contradicted by...documents upon which the pleadings rely.").

---

Dismiss or addressing the issue in his reply. (*Id.*) Rash addressed the correct pleadings in his reply and attached Decedent's intake form and the jail's policy. (ECF No. 56.) Rash argued that the attachments are embraced by the pleading and indicated that Plaintiffs reserved the ability to object. (*Id.* at 2 n.2.) Despite this indication, Plaintiffs have not sought leave with this Court to file a sur-reply or otherwise objected to the Court's consideration of these attachments at the pleading stage.

The Court now analyzes whether Rash's conduct, in light of the duty set forth in the jail policy, is protected by official immunity. "Official immunity...protects public officials sued in their individual capacities from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." *State ex rel. Morales v. Alessi*, 679 S.W.3d 467, 571 (Mo. banc 2023) (quotations omitted). "That an official might exercise poor judgment in a given case does not remove the conduct from the category of discretionary acts." *K.B. v. Waddle*, 764 F.3d 821, 825 (8th Cir. 2014). "A plaintiff must plead facts establishing an exception to official immunity." *Id.* (cleaned up) (quotation omitted). Official immunity does not apply "when a public officer fails to perform a ministerial duty required of him by law[.]" *Id.* (quoting *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 191 (Mo. banc 2019)). "The category of ministerial acts is a narrow one:

> Generally, a ministerial act has long been defined as merely 'clerical.' And this Court has noted that a ministerial duty compels a task of such a routine and mundane nature that it is likely to be delegated to subordinate officials. For more than a century, this Court has held that a ministerial or clerical duty is one in which a certain act is to be performed upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority, and without regard to the public official's judgment or opinion concerning the propriety or impropriety of the act to be performed. Thus, the central question is whether there is any room whatsoever for variation in when and how a particular task can be done. If so, that task – by definition – is not ministerial.

*Id.* (quoting *Alsup*, 588 S.W.3d at 191). "An act is not ministerial simply because the official was commanded to perform the act." *Davis*, 11 F.4th at 629-30. "That a policy or supervisor conveys authority or a duty to 'act in a given situation says nothing about whether the act authorized or compelled is the sort of ministerial or clerical act to which official immunity does not extend.'" *Id.* (quoting *State ex rel. Helms v. Rathert*, 624 S.W.3d 159 (Mo. banc 2021)).

The Court finds that Rash is protected by official immunity, as the determination of whether an arrestee suffers from a serious or chronic illness requiring contacting the shift supervisor was a

discretionary act requiring his judgment, even if poorly exercised. Although the policy mandated Rash notify his supervisor if he observed that the arrestee suffered from a serious or chronic illness, the determination on whether the mandate requirement was met, i.e. whether Decedent suffered from a serious or chronic illness, required Rash's exercise of judgment based on Decedent's answers at booking. *See Davis*, 11 F.4th at 631 ("The jail's policy that officers must report if they believe an inmate is a medical risk does not speak to the nature of the duty for official immunity purposes.") (citations omitted). That Rash's "determination was incorrect or poor judgment does not bring the duty into the realm of being ministerial." *Id.* (citing *Waddle*, 764 F.3d at 825).

Plaintiffs contend Rash's conduct here is like that of the booking officer in *Davis*, who failed to correctly fill out an intake form. 11 F.4th at 632. Specifically, the booking officer in *Davis* answered "no" to the question of whether the inmate was a medical risk during any prior contact or confinement with the department, even though the inmate had been labeled as having special medical conditions during a prior booking. *Id.* at 614, 632. The Court reasoned that "[a]nswering that particular question was clerical, not requiring him to exercise his own judgment," if the officer had access to the prior booking form. *Id.* at 632. Here, unlike in *Davis*, Plaintiffs do not allege that Rash was negligent in filling out the intake form. Rather, they allege that Rash was negligent in failing to report to a supervisor based on the answers provided in the intake form. While completing the form may have been ministerial under *Davis* where the question was clearly satisfied by the department's records, the determination here on whether to elevate to a supervisor based on the answers withing the form required Rash's exercise of judgment. Thus, Rash was performing a discretionary act when he failed to report to a supervisor based on Decedent's answers at booking.

32

Plaintiffs also argue that they have sufficiently pleaded that Rash acted maliciously in failing to obtain assistance for Decedent. *See State ex rel. Love v. Cunningham*, 689 S.W.3d 489, 496 (Mo. banc 2024) (official immunity also does not apply to acts "done in bad faith or with malice," even if those acts are discretionary) (quotation omitted). They contend that Rash acted maliciously in failing to obtain assistance for Decedent not only because he was aware of Decedent's condition and lack of/need for medication at booking and failed to obtain medical care, but also because he was aware of his continued need for medical care and worsening symptoms the next morning and again failed to obtain medical assistance for Decedent despite telling Decedent otherwise. (ECF No. 54 at 6-7; Am. Compl. ¶¶ 29-32, 49-52.) Rash argues, *inter alia*, that Plaintiffs allegations of malice are conclusory. (ECF No. 41 at 8.)

"The Missouri Supreme Court has consistently explained that, in the context of official immunity, '[a] defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another.'" *McGaugh v. Naudet*, --- S.W.3d --- 2026 WL 667847, at *10 (Mo. App. W.D. 2026) (quoting *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. banc 1986) and *Love*, 689 S.W.3d at 496-97). "First, the public official must engage in a wanton act that a reasonable person would know to be contrary to duty. In this context, '[a]n act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.'" *McGaugh*, 2026 WL 667847, at *10 (quoting *Twiehaus*, 706 S.W.2d at 447). "Second, the wanton act reasonably known to be contrary to duty must be done with the 'actual intent to cause injury.'" *Id.* (quoting *Twiehaus*, 706 S.W.2d at 447). "Actual intent to injure cannot be inferred from the qualifying acts…. Thus, there 'must…be evidence that the [public] official

33

had the [specific] intent to injure…the plaintiff.'" *Id.* (quoting *Carlton v. Means*, 688 S.W.3d 625, 631 (Mo. App. E.D. 2024)).

The Court finds that Plaintiffs have failed to plead sufficient facts to plausibly support that Rash acted with malice. Plaintiffs allege that Rash told Decedent he would obtain medical assistance and then failed to do so. (Am. Compl. ¶ 51.) Plaintiffs argue that this allegation sufficiently demonstrates malice, as it shows that Rash was aware of the severity of Decedent's situation and still did nothing. (ECF No. 54 at 6.) While this allegation supports the reasonable inference that Rash' conduct was wanton because he was deliberately indifferent to or consciously disregarded Decedent's safety, it does not show that Rash actually intended to cause Decedent harm. *See McNealy v. City of St. Louis*, 2024 WL 4817299, at *5 (E.D. Mo. Nov. 18, 2024) (finding that allegations showing callous and deliberate indifference and conscious disregard for plaintiff's safety do not demonstrate actual intent required for malice); *McGaugh*, 2026 WL 667847, at *10 (finding that "no matter how reckless" a defendant's conduct was, the conduct alone does not permit an inference of actual intent). Plaintiffs do not allege that Rash failed to obtain medical care because of "intentional wrongdoing" or "ill will." *See Conway v. St. Louis Cnty.*, 254 S.W.3d 159, 165 (Mo. App. E.D. 2008). Indeed, there is no allegation as to why Rash failed to obtain medical care, only that he failed to do so with awareness of the need and risk. *See Carlton*, 688 S.W.3d at 631 (holding that reckless conduct alone does not support inference that public official had the specific intent to cause injury). Plaintiffs otherwise allege Rash's conduct "demonstrates willful, wanton, and/or malicious conduct, and shows complete indifference to or conscious disregard for the safety of [Decedent] and others…." (Am. Compl. ¶ 98.) However, these allegations are conclusory and do not provide facts showing the actual intent required for malice. *See Love*, 689 S.W.3d at 497 (finding bare allegations of malice and bad faith were conclusory and failed to

34

overcome official immunity); *see also Iqbal*, 556 U.S. at 678-79. For these reasons, Plaintiffs fail to allege any facts supporting the reasonable inference that Rash actually intended to harm Decedent.

Thus, Rash is protected by official immunity, and Franklin County's Motion to Dismiss (ECF No. 40) is granted as to Plaintiffs' wrongful death claim against Rash.

<u>**CONCLUSION**</u>

Accordingly,

**IT IS HEREBY ORDERED** that Franklin County's Motion to Dismiss (ECF No. 40) is **GRANTED**, in part, and **DENIED**, in part, as set forth herein. Count II is dismissed with prejudice based on Rash's official immunity and Count IV is dismissed with prejudice only as to the request for punitive damages against Franklin County. In all other respects, Franklin County's Motion (ECF No. 40) is denied, and the denial of qualified immunity is without prejudice.

**IT IS FINALLY ORDERED** that Turn Key's Motion to Dismiss (ECF No. 46) and Poinsett's Motion to Dismiss (ECF No. 48) are **DENIED**.

Dated this 15th day of July, 2026.

_____
**JOSEPH S. DUEKER**
**UNITED STATES MAGISTRATE JUDGE**

35